# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| Jose Carrasquillo, | § | |
| Plaintiff, | § | |
| | § | CASE NO. 5:24-cv-00511 |
| | § | |
| v. | § | |
| | § | |
| TransUnion, LLC; Experian Information | § | |
| Solutions, Inc., | | |
| Defendant. | § | |

COMES NOW Plaintiff **JOSE CARRASQUILLO** ("Plaintiff"), an individual, based on information and belief, to allege as follows:

## INTRODUCTION

1.      This case arises under the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681 *et seq*. Plaintiff seeks redress for the unlawful and deceptive practices committed by the Defendant in connection with its inaccurate, misleading, or incomplete reporting of Plaintiff's debts.

2.      Defendant Experian Information Solutions, Inc. ("Experian") is not properly maintaining Plaintiff's credit file, nor did it properly investigate the issues after receipt of Plaintiff's dispute.

3.      Experian is inaccurately reporting multiple incorrect social security numbers on Plaintiff's credit report which Plaintiff has tried unsuccessfully to remove.

4.      Defendant TransUnion, LLC ("TransUnion") is not properly maintaining Plaintiff's credit file and is reporting multiple accounts incorrectly.

5.      TransUnion is not reporting Plaintiff's EasyCompany, LLC ("Easy") account accurately as discharged in bankruptcy and is inaccurately reporting post-discharge.

6.      TransUnion is not reporting Plaintiff's Pleasanton Finance Co. ("Pleasanton") account accurately as discharged in bankruptcy and is inaccurately reporting post-discharge.

7.      The United States Congress has found the banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system and unfair credit reporting methods undermine the public confidence that is essential to the

continued functioning of the banking system.

8.      A pervasive and fundamental misunderstanding presently thrives in the United States regarding the long-term impact that filing a consumer bankruptcy has on the consumer's creditworthiness. Specifically, consumers tend to believe that since a bankruptcy can be reported on their credit report for ten (10) years, their creditworthiness will be ruined for the same length of time. This is not true.

9.      The *majority* of consumer debtors file a consumer bankruptcy to *raise* their FICO Score and remedy their poor creditworthiness.

10.     In fact, it is possible for consumer debtors to obtain a 700 FICO Score as soon as twelve (12) months from filing a consumer bankruptcy (Chapter 7 or Chapter 13).

11.     Creditors and lending institutions are aware of the misconception that filing a consumer bankruptcy destroys the consumer's creditworthiness of ten (10) years; however, to perpetrate this bankruptcy myth, creditors intentionally and routinely ignore both industry standards and FCRA requirements for accurately reporting bankruptcies, as well as the debts included in those bankruptcies, to keep consumers' credit scores low and their interest rates high.

12.     Creditors know that deviating from recognized credit reporting standards and FCRA requirements will make it difficult for consumers to raise their credit scores and improve their creditworthiness.

13.     This was not the intent of Congress when it enacted the Fair Credit Reporting Act and the Bankruptcy Abuse Prevention and Consumer Protection Act.

**JURISDICTION & VENUE**

14.     Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

15.     This Court has jurisdiction under 28 U.S.C. §§ 1331, 1337, 1367, and 15 U.S.C. § 1681.

16.     This venue is proper pursuant to 28 U.S.C. § 1391(b)(1).

17.     Plaintiff alleges that, for purposes of establishing residency under 28 U.S.C. § 1391(b)(1), the named Defendant conducts sufficient business within the forum state and this Court has personal jurisdiction over each Defendant under 28 U.S.C. §§ 1391(c)(2) and 1391(d).

## GENERAL ALLEGATIONS

18.     Plaintiff alleges that in or about December 2023 he noticed four incorrect social security numbers on his Experian report (the "Incorrect SSNs").

19.     As none of these were Plaintiff's social security number, he believes Experian has mixed his credit file with one or more other consumers.

20.     Attempting to correct the errors, Plaintiff disputed the Incorrect SSNs with Experian; however, Experian refused to remove the Incorrect SSNs.

21.     Plaintiff alleges that it is patently incorrect and misleading for multiple other consumer's social security numbers to remain on his report as it greatly increases the chances for unauthorized hard and soft inquiries (and resulting invasion of privacy and decreased credit score) each time one of those consumers applies for credit but the lender receives Plaintiff's credit report in response.

22.     Plaintiff alleges that it is patently incorrect and misleading for multiple social security numbers to report as it directly decreases creditworthiness by making him appear riskier as a borrower (as it appears he has tried to open fraudulent accounts in the past with fake social security numbers).

23.     Plaintiff alleges that the Easy account was included in his Chapter 7 bankruptcy filing in that the debt occurred pre-petition and was subsequently discharged.

24.     Plaintiff alleges that as early as eight (8) days after his bankruptcy discharge, the Easy account was correctly reported as discharged in bankruptcy on his TransUnion report.

25.     Plaintiff alleges that on or about September 19, 2023, he confirmed to TransUnion that the Easy account was accurately reported as discharged in bankruptcy.

26.     Plaintiff alleges that TransUnion had actual knowledge that the true and accurate reporting of the Easy account was discharged in bankruptcy.

27.     Despite the fact the Easy account was discharged, and despite the fact TransUnion had actual knowledge of this fact, it allowed the Easy account to be changed on or about November 8, 2023 to report as charged off, with an outstanding balance, past due amount, and derogatory post-discharge payment history; all of which is patently incorrect and misleading.

28.     Plaintiff alleges that the Pleasanton account was included in his Chapter 7 bankruptcy filing in that the debt occurred pre-petition and was subsequently discharged.

29.     Plaintiff alleges that as early as eight (8) days after his bankruptcy discharge, the

Pleasanton account was correctly reported as discharged in bankruptcy on his TransUnion report.

30.     Plaintiff alleges that on or about September 19, 2023, he confirmed to TransUnion that the Pleasanton account was accurately reported as discharged in bankruptcy.

31.     Plaintiff alleges that TransUnion had actual knowledge that the true and accurate reporting of the Pleasanton account was discharged in bankruptcy.

32.     Despite the fact the Pleasanton account was discharged, and despite the fact TransUnion had actual knowledge of this fact, it allowed the Pleasanton account to be changed on or about November 9, 2023 to report as charged off, with an outstanding balance, past due amount, and derogatory post-discharge payment history; all of which is patently incorrect and misleading.

33.     Plaintiff alleges that it is patently incorrect and misleading for a debt which was discharged in bankruptcy to report as charged off as it means the debt is still outstanding, legally owed, and collectible.

34.     Plaintiff alleges that it is patently incorrect and misleading for a debt which was discharged in bankruptcy to report with an outstanding balance or past due amount post-discharge, or with post-discharge payment history.

35.     Plaintiff alleges TransUnion's reporting is a failure to maintain maximum accuracy and completeness of his credit file and that these inaccuracies negatively affected his credit score and were published to third parties.

36.     Plaintiff alleges that each Defendant is familiar with FCRA requirements and subscribes thereto.

37.     Plaintiff alleges that each Defendant understands that deviation from the FCRA requirements or credit reporting industry standards can, and often does, result in the denial of credit, higher interest rates, and prompts a negative inference that would not be drawn if the data were reported in accordance with the recognized standards.

38.     Plaintiff alleges that all of Defendants' independent actions alleged herein were committed knowingly, intentionally, and in reckless disregard of the unambiguous meaning of the FCRA, regulatory guidelines on accurate reporting, and credit reporting industry standards to purposefully undermine Plaintiff's ability to repair his Credit Score.

39.     In the alternative, Plaintiff alleges that the Defendants' independent actions were the result of negligent policies, procedures, and an objectively unreasonable interpretation of the FCRA, all which inevitably led to inaccurate, misleading, or incomplete credit reporting.

## FACTUAL BACKGROUND

40.     Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.     Personal Identifiable Information**

41.     Personal identifiable information commonly is known to include name, date of birth, and social security number.

42.     A social security number is the most unique identifier of this information. *See Thompson v. San Antonio Retail Merchants Ass'n*, 682 F. 2d 509 (5th Cir. 1982) (Court noting "[t]he social security number is the single most important identifying factor for credit-reference purposes.").

43.     When a consumer applies for credit or other financing through an entity, the consumer supplies some form of personal identifiable information to the creditor and using that information the creditor conducts a "hard inquiry" by contacting one or more credit bureaus to review a consumer's credit score(s) and other available information in the credit report.

44.     A mixed file is when some or all of the information pertaining to a particular consumer, such as a social security number, is placed in the credit file of another consumer. A mixed credit file can cause unauthorized inquiries and prevent a consumer from opening accounts. *See Robinson v. Equifax Information Services, LLC*, 560 F. 3d 235 (4th Cir. 2009) (detailing how a social security number placed in the wrong credit file caused the incorrect credit report to be pulled and prevented opening of accounts by the actual owner).

45.     Unauthorized inquiries create an increased risk of privacy harm and identity theft. Congress specifically recognized the "elaborate mechanism developed for investigating and evaluating credit worthiness, credit standing, credit capacity, character, and general reputation of consumers" and the "need to insure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy." *Nayab v. Capital One Bank (USA), NA*, 942 F. 3d 480, 492 (9th Cir. 2019).

**B.     FICO, Inc.**

46.     FICO is a leading analytics software company with its principal headquarters in San Jose, California. FICO has over 130 patents related to their analytics and decision management technology and regularly uses mathematical algorithms to predict consumer behavior, including credit risk.

47.     The FICO Score has become the standard measure of consumer credit risk in the United States and is used in ninety percent (90%) of lending decisions. [1]

48.     A FICO Score consists of a three-digit number summarizing a consumer's credit risk or likelihood to repay a loan. FICO periodically updates its scoring models resulting in multiple FICO Score versions.

49.     Base FICO Scores range from 300 to 850, while industry specific FICO Scores range from 250-900. A higher FICO Score demonstrates lower credit risk or less likelihood of default.

50.     Different lenders use different versions of FICO Scores when evaluating a consumer's creditworthiness.

51.     There are twenty-eight (28) FICO Scores that are commonly used by lenders.

52.     A consumer's FICO Score is calculated based solely on information in consumer credit reports maintained at credit reporting agencies ("CRAs").

53.     The three largest CRAs are Experian Information Solutions, Inc.; Equifax Information Services, LLC ("Equifax"); and TransUnion, LLC ("TransUnion").

54.     FICO does not control what information is provided on a consumer's credit report. Instead, the scoring models, or algorithms, are based on the premise that the information provided by the CRAs is accurate and complies with both the FCRA requirements and credit reporting industry standards.

55.     There are five (5) key factors that a FICO Score considers: (1) payment history; (2) amount of debt; (3) length of credit history; (4) new credit; and (5) credit mix.

56.     Each of the five (5) factors is weighted differently by FICO.

57.     In other words, thirty-five percent (35%) of a consumer's FICO Score relates to payment history, thirty percent (30%) relates to the amount of debt, fifteen percent (15%) relates to the length of credit history, ten percent (10%) relates to new credit, and the final ten percent (10%) relates to a consumer's credit mix, which is the different types of debts reported.

58.     Payment history refers to whether a consumer has paid their bills in the past, on time, late, or missed payments. The more severe, recent, or frequent the late payment information,

---

[1] While there are other credit scoring models, it is well established that FICO Score is by far the most widely used by lenders, employers, insurance companies, and lessors. *See https://www.myfico.com* (a website created and operated by Fair Isaac Corporation ("FICO"), "the company that invented the FICO credit score").

the greater the impact on a FICO Score. Public record items, such as bankruptcy, foreclosure, judgments, and wage garnishments are also considered part of a consumer's payment history.

59.     In factoring the severity of delinquent payments, a FICO Score considers how late the payment continues to be, how much is owed, how recently this occurred, and how many delinquent accounts exist.

60.     Once a delinquent account has been remedied, the longer the account stays current the more a consumer's FICO Score should increase.

61.     FICO Scores are entirely dependent upon information provided by data furnishers ("DFs"), such as banks and other financial institutions, to CRAs.

62.     A FICO Score is a summary of your credit report. In simple terms, the FICO Score is calculated by taking the five (5) factors (payment history, amount of debt, length of credit history, new credit, and credit mix) for each account in a credit report and calculating a three digit number for lenders to review. "When you apply for credit, lenders need a fast and consistent way to decide whether or not to loan you money." *See* https://www.myfico.com/credit-education/what-is-a-fico-score. If a lender or employer did look past the FICO Score into a consumer's reports, chances are they either do not understand the tradeline meanings themselves, or, if they do and realize something appears incorrect, they are incapable of recalculating the complex mathematical algorithms in a FICO Score to take the found error into consideration. Therefore, most lenders and employers do not review individual accounts, just a consumer's FICO Score (or average of FICO Scores) in order to make "quicker decisions". *See id*.

63.     Some lenders also use internal scoring models. In these instances, the lenders attempt to produce their own "FICO Score" based upon their internal credit scorecard models. These models are, similar to FICO, based upon algorithms, business rules, codes, etc. and take information reported in the credit reports and assign weights to them in order to assess risk and make determinations as to consumer's creditworthiness. FICO Scores and the scores based off internal models being collectively referred to as "Credit Score".

C.      **e-OSCAR**

64.     e-OSCAR is the web-based system developed by Experian, Equifax, TransUnion, and Innovis that enables DFs and CRAs to create and respond to consumer credit disputes.

65.     When a consumer sends a dispute letter to a CRA, the CRA then sends an automated credit dispute verification ("ACDV") via e-OSCAR to the appropriate DF.

66.     The ACDV contains codes next to certain data fields associated with a credit file.

67.     When a data furnisher reports on a consumer's account as part of its regular reporting, it sends a regular monthly transmission to each CRA.

68.     When a data furnisher reports on a consumer's account outside of its regular monthly transmission, it sends an automated universal dataform ("AUD") to each CRA.

69.     For clarification, an AUD or other regular transmission is sent when the data furnisher initiates reporting on a consumer's account (e.g., opening an account, updating the account each month, closing an account, etc.), whereas an ACDV is how a data furnisher receives a dispute request from the CRAs and how it updates reporting back to the CRAs after its investigation of the matter.

**D.     Bankruptcy Credit Reporting Industry Standards & Consumer Information Indicator**

70.     When a consumer files bankruptcy, certain credit reporting industry standards exist.

71.     Certain data is regularly expected and calculated by FICO when determining a consumer's creditworthiness.

72.     The Consumer Information Indicator ("CII") is a critical field that indicates a special condition that applies to a specific consumer.

73.     It is the credit reporting industry standard to report a very specific CII upon the filing of a consumer bankruptcy.

74.     CII Code "E" denotes that a Chapter 7 bankruptcy has been discharged.

75.     The CII field is a critical field for consumers as it directly relates and impacts a consumer's creditworthiness.

76.     The lack of a CII reported makes it appear that a consumer has not addressed outstanding debt obligations through the bankruptcy process.

77.     Furthermore, the lack of a CII reported suggests that creditors are free to collect against a consumer as an individual, or that no stay exists to prevent in personam collection activity.

78.     Failure to report the correct CII indicator will prompt those making credit decisions to draw a more negative inference than if the appropriate CII indicator were reported.

79.     The FCRA permits a bankruptcy to be reported for ten (10) years from the date the bankruptcy was filed.

80.     A consumer's FICO Score is directly related to the date on which a petition is filed and acknowledged.

81.     The bankruptcy's impact on a consumer's FICO Score lessens with the passage of time.

82.     Accordingly, the failure to reference the bankruptcy filing (CII field) and/or the correct petition date results in a lower FICO Score, which in turn causes credit decision makers to draw a more negative inference regarding a consumer's creditworthiness.

**E.     Plaintiff's Easy account and Pleasanton account were each Discharged in his Bankruptcy**

83.     Plaintiff filed a voluntary petition for Chapter 7 bankruptcy on October 19, 2022 in order to discharge certain debts.

84.     Plaintiff listed Easy and Pleasanton in his bankruptcy Schedules E/F as each holding a nonpriority unsecured claim.

85.     Plaintiff's bankruptcy was discharged on January 21, 2023.

86.     The bankruptcy discharge eliminated any debt owed on the Easy or Pleasanton accounts.

**F.     Plaintiff's Credit Report Contains Inaccurate and Adverse Information, which Plaintiff Disputed to no Avail**

87.     On November 14, 2023, Plaintiff ordered a TransUnion credit report, and on December 8, 2023, Plaintiff ordered an Experian credit report to ensure proper reporting.

88.     Plaintiff noticed four Incorrect SSNs in his Experian credit report despite the fact these were not his social security number, nor had he ever used or seen the numbers.

89.     Plaintiff then disputed the Incorrect SSNs via certified mail to Experian on or about February 8, 2024 (the "Experian Dispute Letter").

90.     Plaintiff's Experian Dispute Letter specifically put Experian on notice that he noticed multiple social security numbers that were not his and were incorrect. Further, the Experian Dispute Letter specifically requested removal of the Incorrect SSNs from his credit report and included a copy of his driver's license and social security card to prove his identity and real social security number.

91.     Plaintiff is informed and believes that Experian received Plaintiff's Experian Dispute Letter and, in response, failed to investigate Plaintiff's dispute, and failed remove the

Incorrect SSNs.

92.     On February 17, 2024, Plaintiff ordered another Experian credit report and TransUnion credit report to determine if his reports were updated.

**a.      Inaccuracy – Incorrect SSNs**

93.     Despite requesting Experian remove the Incorrect SSNs, Experian continued to report the four incorrect numbers on his credit report.

94.     Plaintiff alleges that Experian did not investigate whether Plaintiff specifically requested the Incorrect SSNs be removed.

95.     Experian did not update Plaintiff's credit file accurately.

96.     Experian failed to conduct a reasonable investigation of the information as required by the FCRA.

97.     Experian failed to maintain maximum possible accuracy and completeness standard of the FCRA.

98.     Experian failed to compare his social security card and number to those listed on his report to verify that the Incorrect SSNs were patently incorrect and should be removed.

99.     The lack of investigation and reporting of inaccurate information by Experian is unreasonable.

**b.      Inaccuracy – Easy and Pleasanton**

100.    Despite actual knowledge Plaintiff filed a bankruptcy and received a discharge, and despite the fact it previously reported the account correctly, and that it was affirmed directly to TransUnion that it was correctly reported as discharged, on or about November 8, 2023 TransUnion began to report Plaintiff's Easy account, beginning in 2722xx, as "Charge-off", with an outstanding balance of "$412", a past due amount of "$402", a comment of "Unpaid balance charged off", a "C/O" for charge off in the payment history for November 2023, and without notation of the bankruptcy discharge. This tradeline is patently inaccurate as the account was discharged in bankruptcy in January 2023.

101.    Despite actual knowledge Plaintiff filed a bankruptcy and received a discharge, and despite the fact it previously reported the account correctly, and that it was affirmed directly to TransUnion that it was correctly reported as discharged, on or about November 9, 2023 TransUnion began to report Plaintiff's Pleasanton account, beginning in 43xx, as "Charge-off", with an outstanding balance of "$1,583", a past due amount of "$1,583", a comment of "Unpaid

balance charged off", a "C/O" for charge off in the payment history For October and November 2023, and without notation of the bankruptcy discharge. This tradeline is patently inaccurate as the account was discharged in bankruptcy in January 2023.

102.    Plaintiff alleges that TransUnion had actual knowledge he filed for bankruptcy.

103.    Plaintiff alleges that TransUnion had actual knowledge he received a discharge in his bankruptcy.

104.    Plaintiff alleges that TransUnion had actual knowledge the Easy account was discharged in bankruptcy.

105.    Plaintiff alleges that TransUnion had actual knowledge the Pleasanton account was discharged in bankruptcy.

106.    Plaintiff alleges that on or about September 19, 2023, Plaintiff and TransUnion agreed on the fact that the Easy account was accurately reported as discharged in bankruptcy.

107.    Plaintiff alleges that on or about September 19, 2023, Plaintiff and TransUnion agreed on the fact that the Pleasanton account was accurately reported as discharged in bankruptcy.

108.    From January 27, 2023 through November 2023, TransUnion was correctly reporting each tradeline with a CII Code "E" to reflect each debts were discharged in Plaintiff's Chapter 7 bankruptcy; however, it decided to remove the CII Code "E" and allow each account to report patently incorrect and misleading information.

109.    By reporting Plaintiff's accounts as described hereinabove, it incorrectly appeared to third parties viewing Plaintiff's credit report that the accounts were not discharged in bankruptcy, which is inaccurate.

110.    As Plaintiff received his discharge and the Easy and Pleasanton debts are no longer owed, the reporting is misleading.

111.    The reporting is misleading as the post-discharge payment history and lack of any bankruptcy notations further makes the accounts appear as if each was still outstanding, past due, and not discharged.

112.    The incorrect reporting by TransUnion on the Easy and Pleasanton accounts lowered Plaintiff's Credit Score, which adversely affected Plaintiff's ability to obtain credit.

113.    Given the prior knowledge of how to accurately report these two accounts, the reporting of inaccurate information by TransUnion was unreasonable.

F.      **Damages**

114.    Plaintiff pulled the credit report at issue at a cost for access to the report, after the dispute process, specifically for the sole purpose of verifying that the inaccuracies were fixed.

115.    As a result of the incorrect reporting, Plaintiff has incurred out-of-pocket expenses, and has also suffered emotional harm and excessive stress resulting in doubt as to the effectiveness of the Bankruptcy Code, the Fair Credit Reporting Act, and the power of this Court to preserve and perpetuate a fresh start as intended by Congress.

116.    Plaintiff's inability to obtain credit, resulting from Experian's inaccurate reporting, has caused him to abandon his intentions to apply for certain credit until the issue is resolved.

117.    Due to Experian's refusal to remove multiple other consumer's information from his credit report, Plaintiff has suffered or will imminently suffer an invasion of his privacy and confidential information when one of those consumer's applies for credit or has an existing creditor attempt to pull their report. Experian's errors in reporting have subjected Plaintiff to an increased risk of identity theft, fraud, and other privacy harm, resulting in consequential anxiety and emotional distress.

118.    Experian's actions, as alleged herein, are in direct violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681.

119.    Plaintiff's inability to obtain credit, resulting from TransUnion's inaccurate reporting, has caused him to abandon his intentions to apply for certain credit until the issue is resolved.

120.    Due to TransUnion's inability to maintain maximum accuracy and completeness of his credit file Plaintiff has been denied credit and offered credit at higher than normal interest rates; both resulting in consequential anxiety and emotional distress.

121.    TransUnion's actions, as alleged herein, are in direct violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681.

## FIRST CAUSE OF ACTION

### (Violation of Fair Credit Reporting Act 15 U.S.C. § 1681e(b))

### (Against Experian and TransUnion)

122.    Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.      Experian and TransUnion (collectively, the "CRA Defendants") Each Failed to Assure Credit Reporting Accuracy**

123.    Experian violated 15 U.S.C. § 1681e(b) by failing to establish and/or follow reasonable procedures to assure maximum possible accuracy in the preparation of Plaintiff's credit reports and the credit files it published and maintained concerning Plaintiff.

124.    Had Experian maintained reasonable procedures to assure maximum accuracy, it would have never placed the Incorrect SSNs in Plaintiff's credit file to being with.

125.    Had Experian maintained reasonable procedures to assure maximum accuracy, it would have removed the Incorrect SSNs after receiving Plaintiff's Dispute Letter stating the social security numbers did not belong to him and proving his true social security number with a copy of his card.

126.    Had Experian maintained reasonable procedures to assure maximum accuracy, it would have removed the Incorrect SSNs and investigated the mixed file to determine why the other consumer's social security numbers are tied to Plaintiff's credit file.

127.    Experian knew, or should have known, that reporting of multiple social security numbers, reporting of incorrect social security numbers, or reporting one consumer's social security number on another consumer's credit report does not reflect maximum possible accuracy and completeness as required by the FCRA.

128.    As a result of Experian's violations of 15 U.S.C. § 1681e(b), Plaintiff suffered actual damages, including but not limited to: damage to reputation, embarrassment, humiliation, dissemination of inaccurate information, diminished credit, and other mental and emotional distress.

129.    TransUnion violated 15 U.S.C. § 1681e(b) by failing to establish and/or follow reasonable procedures to assure maximum possible accuracy in the preparation of Plaintiff's credit reports and the credit files it published and maintained concerning Plaintiff.

130.    TransUnion, as part of a prior class action settlement, agreed to modify its procedures regarding the reporting of all subsequent Chapter 7 bankruptcy discharges. *See Acosta v. Trans Union, LLC*, 243 F.R.D. 377, 382 (C.D. Cal. 2007).

131.    As a part of the *Acosta* settlement, TransUnion agreed to update reporting on all "Bankruptcy Qualifying Tradelines" accounts. This includes automatically updating the reporting on such accounts to remove the charge-off or collection rating, deleting any current and/or past

due balances, and adding a bankruptcy notation on the tradeline. *Id*.

132. Further, TransUnion agreed to establish procedures that it will, of its own volition, update any Bankruptcy Qualifying Tradelines subject to a reinvestigation request, by removing the derogatory information and adding bankruptcy notation. *Id*.

133. TransUnion failed to report the Easy account or Pleasanton account using the procedure it expressly agreed to adopt in *Acosta*.

134. TransUnion failed to report the Easy account or Pleasanton account using the knowledge it had affirmatively obtained from Plaintiff in September of 2023.

135. Had TransUnion maintained reasonable procedures to assure maximum accuracy, it would have never reported the Easy account as described herein.

136. TransUnion knew (1) that the Easy account was discharged in bankruptcy, (2) that the tradeline should reflect the discharge, and (3) that the account should not have been reported as charged off, with an outstanding balance, past due amount, or with post discharge payment history as the debt was discharged. Further, TransUnion knew that this inaccurate and incomplete tradeline does not reflect *maximum possible accuracy and completeness* as required by the FCRA.

137. Had TransUnion maintained reasonable procedures to assure maximum accuracy, it would have never reported the Pleasanton account as described herein.

138. TransUnion knew (1) that the Pleasanton account was discharged in bankruptcy, (2) that the tradeline should reflect the discharge, and (3) that the account should not have been reported as charged off, with an outstanding balance, past due amount, or with post discharge payment history as the debt was discharged. Further, TransUnion knew that this inaccurate and incomplete tradeline does not reflect *maximum possible accuracy and completeness* as required by the FCRA.

139. As a result of TransUnion's violations of 15 U.S.C. § 1681e(b), Plaintiff suffered actual damages, including but not limited to: damage to reputation, embarrassment, humiliation, dissemination of inaccurate information, diminished credit, and other mental and emotional distress.

140. TransUnion is reporting Plaintiff owes debts that he does not actually owe, thereby damaging his credit score and creditworthiness.

141. TransUnion's reporting is particularly aggravating of Plaintiff's damages because the inaccurate reporting damaged Plaintiff's creditworthiness, which he is attempting to rebuild

after bankruptcy.

142.    Congress specifically recognized the "elaborate mechanism developed for investigating and evaluating credit worthiness, credit standing, credit capacity, character, and general reputation of consumers." *Nayab v. Capital One Bank (USA), NA*, 942 F. 3d 480, 492 (9th Cir. 2019)*.* The investigation and evaluation of Plaintiff's creditworthiness, credit standing, credit capacity, character and general reputation as a consumer are all damaged by the inaccurate reporting Experian and TransUnion independently allowed.

**B.    Willful Violations**

143.    The CRA Defendants' independent violations, as described herein, were willful; specifically, the CRA Defendants have intentionally and purposefully set up a system where inaccuracies are not only probable, but inevitable.

144.    The CRA Defendants regularly, as a policy, ignore disputes by consumers and fail to perform even a basic investigation regarding the disputes. Additionally, the CRA Defendants regularly fail to forward disputes to data furnishers, thereby frustrating the entire dispute process.

145.    To the extent the CRA Defendants do send consumer disputes, they send these disputes to employees who do not live within the continental United States to hide or subvert a consumer's liability to confront the individual(s) directly responsible for approving accurate reporting.

146.    The CRA Defendants' respective employees receive little to no training concerning how to accurately report consumer debt.

147.    Instead, the CRA Defendants' respective employees are instructed to parrot whatever information a data furnisher provides regardless of whether the information is accurate.

148.    The CRA Defendants' respective employees are regularly expected to review and approve over ninety (90) disputes per day, rendering less than five (5) minutes to review, investigate, and respond to each dispute received.

149.    The CRA Defendants have intentionally set up this system in order to undermine, hide, and otherwise frustrate consumers' ability to properly dispute and correct credit reports.

150.    As a result of the CRA Defendants' independent violations of 15 U.S.C. § 1681e(b), Plaintiff suffered actual damages, including, but not limited to: damage to reputation, embarrassment, humiliation, dissemination of inaccurate information, diminished credit, and other mental and emotional distress.

151.    TransUnion's violations were willful, rendering it individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

152.    In the alternative, TransUnion was negligent, which entitles Plaintiff to recover under 15 U.S.C. § 1681o.

153.    Plaintiff is entitled to recover actual damages, statutory damages, costs, and attorneys' fees from TransUnion in an amount to be determined by this Court pursuant to 15 U.S.C. § 1681n and § 1681o.

154.    Experian's violations were willful, rendering it individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

155.    In the alternative, Experian was negligent, which entitles Plaintiff to recover under 15 U.S.C. § 1681o.

156.    Plaintiff is entitled to recover actual damages, statutory damages, costs, and attorneys' fees from Experian in an amount to be determined by this Court pursuant to 15 U.S.C. § 1681n and § 1681o.

## SECOND CAUSE OF ACTION

### (Violation of Fair Credit Reporting Act 15 U.S.C. §1681i(a)(1))

### (Against Experian)

157.    Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.    Experian Failed to Reinvestigate Following Plaintiff's Dispute**

158.    Pursuant to 15 U.S.C. § 1681i(a)(1), Experian was required to conduct a reasonable investigation and to delete any information that was not accurate after receiving notice of Plaintiff's dispute regarding the Incorrect SSNs.

159.    Thus, Experian failed to conduct a reasonable investigation and remove the misleading and/or inaccurate social security numbers on Plaintiff's credit file within the statutory time frame.

160.    Plaintiff alleges Experian is readily familiar with FCRA requirements and credit reporting industry standards.

161.    Experian failed to conduct a reasonable investigation because any basic investigation would have uncovered that Plaintiff was clearly requesting removal of the Incorrect

SSNs and should have uncovered the fact Experian was reporting multiple other consumer's social security numbers in Plaintiff's credit file.

162.    Had Experian conducted a proper investigation, it should have removed the Incorrect SSNs. However, Experian not only failed to remove the Incorrect SSNs, but also failed to conduct any type of investigation into the alleged mixed file reporting incorrect personal information.

163.    Experian, therefore, did not conduct even the most basic investigation regarding credit reporting industry standards, otherwise the aforementioned would have been uncovered.

164.    The failure by Experian to investigate was a violation of the FCRA.

### THIRD CAUSE OF ACTION

### (Violation of Fair Credit Reporting Act 15 U.S.C. § 1681i(a)(4))

### (Against Experian)

165.    Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.      Experian Failed to Review and Consider all Relevant Information**

166.    Experian violated 15 U.S.C. § 1681i(a)(4) by failing to review and consider all relevant information submitted by Plaintiff.

167.    Experian's violations of 15 U.S.C. § 1681i(a)(4) have caused Plaintiff to suffer actual damages, including, but not limited to: damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

**B.      Willful Violations**

168.    Experian's violations were willful, rendering it individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

169.    In the alternative, Experian was negligent in failing to review and consider all relevant information Plaintiff submitted, which entitles Plaintiff to recovery under 15 U.S.C. § 1681o.

170.    Plaintiff is entitled to recover actual damages, statutory damages, costs, and attorneys' fees from Experian in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

## FOURTH CAUSE OF ACTION

## (Violation of Fair Credit Reporting Act 15 U.S.C. § 1681i(a)(5)(A))

## (Against Experian)

171.     Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.      Experian Failed to Delete Disputed and Inaccurate Information**

172.     Experian violated 15 U.S.C. § 1681i(a)(5)(A) by failing to promptly delete the disputed inaccurate items of information from Plaintiff's credit file or modify the item of information upon a lawful reinvestigation.

173.     Experian's violations of 15 U.S.C. § 1681i(a)(5)(A) have resulted in Plaintiff suffering actual damages, including, but not limited to: damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

**B.      Willful Violations**

174.     Experian's violations were willful, rendering it individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

175.     In the alternative, Experian was negligent, which entitles Plaintiff to recovery under 15 U.S.C. § 1681o.

176.     Plaintiff is entitled to recover actual damages, statutory damages, costs, and attorneys' fees from Experian in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

## PRAYER FOR RELIEF

177.     WHEREFORE, Plaintiff prays for judgment as follows:

a.   For preliminary and permanent injunctive relief to stop Defendant from engaging in the conduct described above;

b.   Award statutory and actual damages pursuant to 15 U.S.C. § 1681n;

c.   Award punitive damages in order to deter further unlawful conduct pursuant to 15 U.S.C. § 1681n;

d.   Award attorneys' fees and costs of suit incurred herein pursuant to 15 U.S.C. §§ 1681n and 1681o;

e.   For determination by the Court that Defendant's policies and practices are

unlawful and in willful violation of 15 U.S.C. § 1681n, *et seq*.; and

f. For determination by the Court that Defendant's policies and practices are unlawful and in negligent violation of 15 U.S.C. § 1681o.

Respectfully submitted,

**SCHUMACHER LANE PLLC**

Dated: May 16, 2024

*/s/ Joshua B. Lane*
Joshua B. Lane
Texas Bar No. 24092665
P.O. Box 558
Spring Branch, TX 78070
210-541-2154 ph
210-783-1383 fax
Attorneys for Plaintiff

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial of this matter by jury.

Dated: May 16, 2024

*/s/ Joshua B. Lane*
Joshua B. Lane